PARIS & G. N. R. CO. et al. v. FLANDERS.

(Court of Civil Appeals of Texas. Texarkana. Feb. 26, 1914. On Motion for Rehearing, April 2, 1914.)

1. MASTER AND SERVANT (§ 276*) — ACTIONS FOR INJURIES—QUESTIONS FOR JURY.

In a railroad switchman's action for injuries caused by a car on which he was riding colliding with a standing car on a switch track, evidence *held* insufficient to make a question *for the jury as to whether the company's* negligence in permitting a freight engine to stand in the yards, with a brilliant headlight burning, contributed in any way to the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. § 276.*]

2. APPEAL AND ERROR (§ 1027*)—HARMLESS ERROR—ERRORS NOT AFFECTING RESULT.

A judgment will not be reversed for error, unless it probably caused the rendition of an improper judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4033; Dec. Dig. § 1027.*]

3. APPEAL AND ERROR (§ 1062*)—HARMLESS ERROR—SUBMISSION OF ISSUES.

Where there was ample evidence of negligence regarding an act which was not a proximate cause of an injury, while the evidence regarding an act which might have been a proximate cause was meager, the erroneous submission of the first act could not be held harmless, under the general rule that, if there are two grounds of recovery—one supported by the evidence, and the other not—both of which are submitted, a verdict for plaintiff should be referred to that ground authorized by the evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4212–4218; Dec. Dig. § 1062.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

**4. MASTER AND SERVANT (§ 154\*)—LIABILITY FOR INJURIES—FAILURE TO WARN—KNOWLEDGE FROM OTHER SOURCES.**

The failure of a foreman in a railroad yard to inform a switchman that a car had been left in such position that one upon which he was required to set the brakes might collide therewith was not a ground of recovery, even though it was his duty to give such information, if the switchman knew from other sources the position of the car.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 308, 309; Dec. Dig. § 154.\*]

On Motion for Rehearing.

**5. APPEAL AND ERROR (§ 882\*)—INVITED ERROR—SUBMISSION OF ISSUES.**

In a railroad switchman's action for injuries, defendant could not complain of the submission, as a ground of recovery, of its negligence in permitting an engine with a brilliant headlight to stand in the yards, though this was not a proximate cause of the injury, where the special charges requested by it called for a determination of the same issue of fact.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3591–3610; Dec. Dig. § 882.\*]

**6. WITNESSES (§ 405\*) — TESTIMONY SUBJECT TO CONTRADICTION—COLLATERAL MATTERS.**

In an action for personal injuries, plaintiff's denial on cross-examination that he was allowed to resign from a third party's employ on account of his drinking related to a collateral matter, and could not be contradicted.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1273, 1275; Dec. Dig. § 405.\*]

**7. DAMAGES (§ 173\*)—EVIDENCE—PERSONAL INJURIES—INABILITY TO OBTAIN EMPLOYMENT.**

In a railroad switchman's action for injuries, where there was evidence tending to show that plaintiff's efficiency for railway service was thereby impaired, evidence that a physical test was required of railroad employés was admissible as tending to show the consequences of his impaired efficiency, and that he probably would not be able to secure employment in the railway service, though it was not shown that defendant required any such test.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 490–492, 501; Dec. Dig. § 173.\*]

**8. TRIAL (§ 85\*) — OBJECTIONS TO EVIDENCE ADMISSIBLE IN PART.**

In an action for personal injuries, the testimony of a physician, that he examined plaintiff, and found a Colle's fracture of the wrist and a fracture involving the left elbow, that there was marked stiffness in the use of the elbow and arm, and a weakness in the use of both hands, that he tested the left arm in different positions with reference to its use, and tested plaintiff's grip in both hands, that his ability to grip was considerably impaired, that there was difficulty in the use of the elbow joint and the left arm in raising and straightening it, and that, in his opinion, plaintiff's ability to perform the duties of a railroad switchman or brakeman had been considerably impaired, was properly admitted over the objection, made to the testimony as a whole, that it was hearsay, and based on information furnished the witness by plaintiff, as some of the facts detailed were not necessarily derived from that source.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 222, 223–225; Dec. Dig. § 85.\*]

Appeal from District Court, Lamar County; A. P. Dohoney, Judge.

Action by Charles Flanders against the Paris & Great Northern Railroad Company and others. Judgment for plaintiff, and defendants appeal. Affirmed on rehearing.

Terry, Cavin & Mills, of Galveston, Andrews, Ball & Streetman, of Houston, and Wright & Patrick, of Paris, Tex., for appellants. Carlock & Carlock, of Ft. Worth, for appellee.

HODGES, J. The appellee sued the appellant, and recovered a judgment for personal injuries. In his petition he alleged substantially the following facts: That in May, 1912, the appellants jointly operated a switchyard in the city of Paris, Tex., in which the plaintiff was employed in the capacity of a switchman. About 3 o'clock on the night of May 25, 1912, while in the performance of his duties, he was thrown violently from the top of a box car to the ground, sustaining severe and painful injuries, which are particularly described.

The specific acts of negligence charged are, first, that the defendants permitted one of their engines attached to a freight train, and equipped with a powerful electric headlight, to stand on one of the side tracks in the yard; that the presence of the headlight rendered the performance of plaintiff's duties dangerous by reason of the glare he encountered; that it had the effect of blinding him so that he could not safely perform his work. It is further alleged that just before the accident occurred the switch engine with which the appellee was working had kicked some box cars south on the side track in the southern portion of the yard, and it became plaintiff's duty to then mount the cars and set the brakes thereon for the purpose of controlling their movements; that, in order to do this, he climbed to the top of the cars by means of ladders on the sides so as to reach the brakes and apply the same; that, while he was in the act of climbing upon the top of said cars in the performance of his duty, the glare of the headlight shone directly upon him, and upon the track where he was at work, thereby blinding him, and rendering it difficult for him to see the objects surrounding him as he otherwise would have been able to do; that, by reason of negligence in failing to obscure the light, he was unable to set the brakes on the car, or stop the same, before it collided with another car farther south on the track; and that, as a result of the collision, the plaintiff was thrown with great force to the ground and injured.

As a second ground of recovery, appellee alleged that the appellants were guilty of negligence proximately causing his injury in permitting the car which was struck by the one upon which he was riding to remain in the position it was at the time of the accident, without notifying him of its presence; that the car referred to was left on what was

---

known as the "lead," or "crossover," track from the stockyards track to another track in the yards running to what was called the "rip track," or repair track; that the car so left on said lead track was one of a group of five cars that had been coupled to the engine on the east side of the yard by the crew to which the appellee belonged a short time before the accident; that, when the engine was connected with the five cars, the foreman in charge called to the plaintiff, who was then acting as "long field man," using the expression, "rip track," and immediately gave the signal for the engine to move; that appellee understood from the expression used by the foreman that all of the cars in that train were to be carried over to the west side of the yards and placed upon the repair track; that it then became the duty of the appellee to go to that side of the yard and be ready to catch the cars as they were cut off and kicked towards him. It is also averred that the use of the expression, "rip track," fairly and reasonably meant and conveyed to the mind of the plaintiff the impression, according to the usage and custom in railroad yards, that all of the cars in that train would be carried over and placed upon the rip track, and none of them would be left on the lead; that no notice or information was given to appellee by any member of the switching crew that any of these cars were to be left on the lead, and he did not expect or understand that one would be left in that situation. It is further alleged that, in violation of the customary methods of doing this work, and without giving the plaintiff any notice of any change in the manner of its performance, the members of the switching crew cut off one of these cars, and left it on what is known as the "lead" track, while the plaintiff was in another portion of the yard; that, when another car had been kicked out towards him, which it was his duty to stop, he endeavored to do so, and, while climbing up on top of same for the purpose of setting the brakes, in the darkness, and not knowing of the presence of the car that had been left on the lead, the car upon which he had mounted came suddenly and unexpectedly in violent contact with the other, causing him to be thrown violently to the ground, resulting in the injuries of which he complains. The petition then proceeds to set out in detail the character and extent of the injuries resulting from the fall.

[1] A trial before a jury resulted in a verdict and judgment in favor of the appellee for $5,000. Both of the railway companies have appealed, and join in the same briefs and assignments of error.

It will be observed that there were two separate and distinct acts of negligence charged as the cause of the injuries sustained. The first was in allowing the road engine to stand in the yards, with a brilliant electric headlight burning, while the appellee and his crew were doing their work of switching. The second was in leaving a box car on the lead near the rip track, without giving notice to the appellee that this would be done. The court submitted both of these as grounds of recovery. The appellee testified that he had been employed as a switchman by the appellants some time in the previous October, and at the time he was injured was performing the duties of what was called a "long field man." He was working under the immediate supervision of a foreman named Mayfield. It appears from the record that it was the duty of the long field man to turn the switches, and to mount and set the brakes on cars that had been kicked or shunted in his direction. The crew to which the appellee belonged consisted of four men besides himself and the foreman, Mayfield. These were the engineer and fireman in charge of the switch engine, Sanders, called the "short field man," and Williams, designated as the "pin puller." The entire crew was under the immediate supervision of Mayfield on this occasion. The tracks in the yards at Paris run north and south. The stock pens are located near the south end of the yards, and on the east side. The repair tracks, commonly referred to as the "rip tracks," and the repair shops were on the west side of the yards, practically opposite the stock pens. Between the stock pens and the repair tracks were the main line and some other tracks used for various purposes. The freight and passenger depots were near the north limits of the yards. On the night of the injury, after spending some time working at the north end of the yard, the foreman gave the order to go to the switch leading to the stock pens. Upon arriving there, the engine was coupled to five box cars. Mayfield, the foreman, testified that this group consisted of three bad-order cars, one car loaded with merchandise, which he desired to place upon the house track, and a good-order empty car to be left in some other position in the yard. Mayfield desired to take the bad-order cars to the rip track for repair, and to carry the others to the north end of the yard. He says that he so notified the engineer and switchmen when he gave the signal to move after the coupling had been made. Appellee, however, testified that the foreman, before giving the signal to move, used the expression, "rip track," and that appellee inferred from this that all of the cars in that train were to be placed upon the rip track, and that none of them would be left on the lead. The foreman, on cross-examination, admitted that he might have used that expression in calling to the long field man. According to the foreman's testimony, which is not disputed, the train of five cars referred to was made up as follows: The merchandise car was on the extreme south end; next came the two bad-order cars; then a good-order empty; and next to the engine was the third bad-order car. When the train was switched over to the lead, with which

the various repair tracks were connected, the merchandise car was left at some point on the lead. A diagram appears to have been used at the trial; but it is not incorporated in the record, and we are unable from the testimony of the witnesses to determine the exact relative position in which this merchandise car was left. The two bad-order cars were then kicked to one of the rip tracks. This being done, the good-order empty was kicked down the lead toward the merchandise car. The appellee testified that, after coupling the cars at the stock pens, the engine and the other members of the crew went north for the purpose of coming down the lead to the rip track, but that he went directly west across the yards, lined up the switches on the main line, and then took his position on the lead near the rip track to catch the cars as they were kicked down that way. He says that he saw two cars pass down in charge of Sanders, the short field man; that when the next car came he mounted it for the purpose of setting the brakes, thinking that it was to go on to one of the repair tracks. He says he climbed to the top, and just as he "straightened himself" the car collided with another which had been left upon the lead, and he was thrown violently to the ground. As a result of the fall, his arms were broken, and he was otherwise injured. We gather from the evidence that the car which appellee mounted was the fourth car that had been kicked down the track, and that it collided with the merchandise car. It appears from Mayfield's testimony that this car had been disconnected by him before any of the others had been kicked in that direction. He says that his purpose in leaving it in that position was to prevent the necessity of making an extra trip to the north end of the yards. The evidence further shows that at the time this switching was being done a freight engine destined to carry a train south within a short time thereafter, equipped with a brilliant electric headlight, was standing about 250 yards north and a little west of where the appellee was when he mounted the car from which he fell. This engine had been standing there about 30 minutes. The front of the engine was towards the south, and the light shone directly over the space occupied by the appellee when he mounted the car. It was claimed in the petition that the brilliancy of the light interfered with the switchmen in the performance of their duties, and that the lights should have been hooded, or turned low, or in some way obscured so as to prevent blinding the men while at their work.

After submitting the issue of negligence in leaving a car upon the lead near the repair tracks, without notifying the appellee that this would be done, the court gave the following instruction as to negligence regarding the electric headlight: "Or, if you believe from the evidence that at the time of the aforesaid accident and injury to plaintiff the defendants, by their employés, permitted a road engine to stand in the yards, with an electric headlight shining, and that such light was of such brilliance as to render it dangerous to switchmen in the discharge of their duties, and that, in attempting to go upon and stop said car, as set out in the preceding paragraph hereof, such light blinded plaintiff so he could not see the standing car aforesaid, or interfered with him in the discharge of his duty, and that permitting such light, if it was permitted, was negligence which proximately caused plaintiff's injuries, you will find for plaintiff, unless you find for defendants under subsequent paragraphs hereof."

It is insisted that this charge is erroneous because not warranted by the evidence. An examination of the record has convinced us that this contention is correct. There was sufficient evidence, it is true, for the jury to conclude that it was negligence to permit the freight engine to stand in the yards, with a brilliant headlight burning, under the circumstances described in this case. But, conceding that to be true, the evidence fails to establish the fact that this particular act of negligence in any way contributed to the injury sustained. It is true that the appellee states as a conclusion that it did have some effect in bringing about his injury; but a fair analysis of the facts to which he testified shows that this was practically impossible. For instance, he testified that the engine with the headlight was north and a little west of him, 250 yards distant. The car with which that on which he rode collided was to the south. Hence, in looking towards that car for the purpose of discovering its presence, his eyes would be turned away from the dazzling effects of the headlight. He also testified that before mounting the car he looked down the track and failed to see the merchandise car standing on the lead. He gives as a reason the fact that some other intervening objects interfered with his vision. According to his further testimony, when he reached the top of the car, and just as he "straightened himself," the collision occurred, and he fell. In this state of the evidence we think it was clearly error for the court to submit that issue to the jury.

[2-4] But the next question is: Should this error reverse the case? Not unless it can be said that it probably caused the rendition of an improper judgment. Generally where there are two grounds of recovery—one supported by the evidence, and the other not—and both are submitted to the jury, a verdict for the plaintiff should be referred to that ground which is authorized by the evidence. Under the peculiar facts of this case, however, we do not think it can be said that the error had no effect in bringing about the verdict rendered. It can hardly be said that the foreman, Mayfield, was guilty of negligence in leaving the merchandise car on the lead. His negligence, if any, consisted in the fail-

ure to give appellee notice that this would be done, or that it had been done. In order to prove that the appellee was not required from the orders of the foreman to anticipate that the car would be left in that situation, he testified that, according to the custom and usage among railroad men engaged in that line of business, the use of the expression, "rip track," by the foreman, under the circumstances, signified that all of the cars were to be carried to the repair tracks, and that none of them would be left upon the lead. In support of this, appellee introduced the testimony of several witnesses to the same effect, who claimed to be familiar with the usage and custom in such matters in the different railway yards of Texas. But, conceding that such a custom prevailed, and that the appellee had a right to draw the inference which he says he did in this instance, yet, if he knew from other sources that the car was left in that position, there was no basis for a recovery upon that ground of negligence. Much evidence was introduced tending to show that the appellee knew of the presence of the merchandise car, and that the accident was due to an error on his part in miscalculating the distance between it and the car on which he was riding. The only evidence to the contrary was his unsupported denial. Appellants introduced in evidence a written statement made by the appellee soon after the injury occurred, in which the following language was used: "We were cutting cars for the rip track and the lead track. I caught a car that had been kicked onto the lead track, and climbed on it. I got on top all right; but this car struck the next car sooner than I expected, and it knocked me off." In his cross-examination regarding this statement the appellee gives this explanation: "I remember that [the statement] being read over to me. That was correct. I made that statement at a time when it was fresh in my memory, on May 28, 1912, three days after the accident occurred. When you gave me that statement a little while ago, I read it over to see whether it was correct, and it was correct as far as I know; yes, sir. It is not the truth, as stated in that statement, that I struck that other car sooner than I expected, and that is what caused me to fall off the car, and that I knew the other car was there. I did not know that the other car was on the track. That statement was made while I was in misery. I did not know what I was saying. It was three days after the accident, and I was all broke up. I was not unconscious that I know of." Appellee also admitted that, in going from the stock pens track to the place where he mounted the car, he passed within about 33 feet of the merchandise car with which he collided, and was only about 40 or 50 feet distant from that car at the time he undertook to get on the car from which he fell. Taking all these facts into consideration, together with what the evidence shows were the duties of a switchman occupying the position of the appellee, and all of the circumstances and conditions under which he was working on that occasion, the jury must have given very great weight to his unsupported testimony, or must have taken into consideration the presence and condition of the electric headlight on that occasion. We have, then, this situation: There was ample evidence of negligence regarding an act which could not be considered a proximate cause of the injury, and but meager evidence regarding an act which may have been a proximate cause. It is exceedingly probable that, in reaching the verdict they did, the jury took into consideration all of the facts and all of the conduct charged against the appellants, and based their finding on the conditions as a whole. We are of the opinion that the error committed by the court in giving the charge quoted probably led to the rendition of an improper verdict.

The third assignment of error complains of several separate and distinct rulings of the court in admitting evidence, and will not be considered. The same objection applies to the seventh assignment. All of the remaining assignments which are not virtually disposed of, or their consideration rendered immaterial, by the assignment which we have sustained are overruled.

For the error in giving the charge referred to, the judgment is reversed, and the cause remanded.

### On Motion for Rehearing.

[5] It is insisted in the motion for a rehearing that the charge submitting the issue of negligence on the part of the appellant in permitting a road engine, equipped with a brilliant headlight, to stand in the yards at the time, if erroneous, was invited by certain special charges presented by the appellant. Upon further consideration we have concluded that this contention is correct. Some of the special charges requested and refused by the court embody in substance the same propositions of law, and call for a determination of the same issue of fact, as those involved in that portion of the charge which we held erroneous. This being true, the error should not cause a reversal of the judgment. Railway Co. v. Sein, 89 Tex. 65, 33 S. W. 215, 558.

In view of the disposition which we make of the case, it is proper that we should discuss some of the remaining assignments of error.

[6] Upon the trial the defendant offered to prove by N. H. Ragland that the appellee had at one time been employed by the Paris & Mt. Pleasant Railroad Company, and had been allowed to resign from that service on account of his drinking while on and off duty. This testimony was excluded on objection. It appears from the bill of exception that appellee had been asked, upon cross-examination, if he had not been permitted to

resign under the conditions mentioned, and he had answered that he had not. This testimony was evidently intended for the purpose of impeaching the appellee upon that issue. This was a collateral matter, and the court ruled correctly.

[7] On his direct examination the appellee was asked this question: "Do you know whether there is any test required on the part of railroads as to the physical condition of their employés?" An answer to this was objected to by appellant, on the ground that it was immaterial. The objection was overruled, and the appellee answered, "You have to stand a physical examination by a doctor before you can be employed." There was no error in the ruling complained of. Other testimony offered by the appellee tended to show that his injuries were of a character that impaired his efficiency for railway service. The evidence objected to was material as tending to show the consequences of his impaired efficiency, and that, because of the fact that a physical examination is required, he probably would not thereafter be able to secure employment in the railway service. The fact that it was not shown that the appellant required any such test does not justify the exclusion of the proffered evidence.

[8] The appellee was permitted to read to the jury portions of the deposition of Dr. Axtel, a physician, who examined the appellee at the instance of his counsel for the purpose of testifying as to the appellee's physical condition. Dr. Axtel stated, in substance, that he had examined the appellee, and found that he had suffered Colle's fracture of the right wrist and a fracture involving the left elbow; that there was marked stiffness in the use of the elbow and of the left arm, and a weakness in the use of both hands. He had tested the left arm in different positions with reference to the use that could be made of it, and had also tested the appellee's grip in both hands. Appellee's strength or ability to grip with his hands was considerably impaired. He also found that there was some difficulty in the use of the joint of the elbow and of the left arm when an effort was made to raise it and straighten it. He gave it as his opinion that the appellee's ability to perform the duties required of a switchman or brakeman in climbing up and down cars, operating brakes, and making couplings had been considerably impaired. He testified in detail regarding other physical conditions found to exist. This testimony was objected to upon the ground that it was self-serving and hearsay; that the answers showed that the opinion of the witness was based solely on what was told him by the plaintiff as to his physical condition. We do not think this objection tenable. It does not fall within the rule announced in the cases referred to. While some of the facts detailed by the witness may have been based upon what the appellee told him, others were not necessarily derived from that source. The objection was to all of this testimony. While some of it may have been subject to exclusion, clearly all of it was not.

We have carefully considered all of the remaining assignments of error, and have found no ground for reversing the judgment.

The motion for a rehearing is granted, and the judgment of the district court is affirmed.